## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                  Case No. 13-CR-20394
                                    Honorable Denise Page Hood

D-1 JOSHUA WINSTON,

        Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [DK# 22] AND DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS/CONFESSIONS [DK# 23]

This matter comes before the Court on Defendant's Motion to Suppress Evidence **[Docket No. 22, July 26, 2013]** and Defendant's Motion for an Evidentiary Hearing to Determine the Voluntariness of Defendant's Statement/Confession **[Docket No. 23, filed July 26, 2013]**, in which Defendant requests that the Court suppress statements he made to officers. On August 21, 2013, the Government filed a response to these motions. **[Docket Nos. 26, 27]** For the reasons discussed below, Defendant's Motion to Suppress Evidence is **DENIED**. Defendant's Motion for an Evidentiary Hearing to Determine the Voluntariness of Defendant's Statement/Confession, as to Defendant's request for a hearing, is **GRANTED**. Defendant's Motion for an Evidentiary Hearing to Determine the Voluntariness of

Defendant's Statement/Confession, as to Defendant's request to suppress his statements, is **DENIED**.


## I.    BACKGROUND

On May 23, 2013, the grand jury indicted Defendant Joshua Winston on three counts:  Felon in Possession of a Firearm, 18 U.S.C. § 922( g)(1) (Count One); Possessing a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c) (Count Two); Possession with Intent to Distribute Marijuana, 21 U.S.C. § 841(a)(1) (Count Three); and a forfeiture allegation as to "any firearm and ammunition involved in or used in the knowing commission of the offense."  The Magistrate Judge ordered Defendant detained pending trial, based on the consent of the Defendant **[Docket No. 7, filed April 29, 2013]**.

### a.    Police Report

On April 13, 2013, at around 3:00 p.m., Detroit Police Officers Edward Jackson, Thomas Rogers, and Stephen Kue, received a radio dispatch alerting them that shots were being fired in the area of 8600 Piedmont.  Officer Jackson's report notes that the area was "a location of . . . known narcotic[s]" but that he and his partner did not observe anyone firing shots.  Officer Jackson made a southbound turn onto Warwick from Van Buren and observed Defendant and a front passenger,

2

Desmond Killian, in an olive 2002 Ford Taurus.  The vehicle was legally parked in front of 8490 Warwick where Officer Jackson states he had "prior experience with narcotics investigations."   Officer Jackson approached the vehicle to inquire if Defendant and Mr. Killian had heard or seen anyone fire shots in the area and while approaching, observed Defendant "reach forward and make several movements toward the front floorboard of the vehicle."

After making contact with Defendant, Officer Jackson "could immediately detect the odor of unburned marijuana emitting from the vehicle" and asked Defendant to step out of the vehicle.  After Defendant exited the vehicle, Officer Jackson "observed the wooden handle of a black .32 Smith & Wesson revolver protruding from . . . underneath the driver [] seat, the same area where [he] observed [Defendant] reaching."  Officer Jackson states that after he recovered the handgun, Defendant voluntarily stated, "Man I was just robbed, that is why I'm packing heat." Defendant was subsequently arrested for possession of a handgun after he was unable to produce a concealed pistol permit.  Also recovered from the vehicle's driver side door panel was a burgundy case containing 6 small zipped bags, which contained what the officers suspected to be marijuana.  Defendant asserts that he never agreed to waive his *Miranda* rights.

**b.**    **Hearing**

On November 15, 2013, the Court held a hearing on Defendant's motions. At the hearing, three Detroit Police Officers testified: Officer Thomas Rogers, Officer Stephen Kue, and Officer Edward Jackson.

### i.    Officer Thomas Rogers

Officer Rogers testified that he has been a Detroit police officer for fifteen years. Officer Rogers stated that he was the passenger in the scout car on April 13, 2013, and that after receiving a radio call about shots being fired, he, Officer Stephen Kue, and Officer Edward Jackson, went to the area of 8600 Piedmont to look for victims and/or perpetrators. Officer Rogers testified that based on his fifteen years of experience and calls that he had responded to within that time period, the area was a high crime area. Officer Rogers told the Court that he did not see anyone at 8600 Piedmont. He did see a Taurus parked and idled facing northbound on Warwick Road, about a block and a half from the area identified in the radio call.

Officer Rogers further testified that upon seeing the vehicle, the officers stopped to talk to the occupants to see if they had heard gun shots or had seen someone who may have been shot. Officer Rogers saw two people in the vehicle and identified Defendant as the person in the driver's seat. Officer Rogers testified that he approached the passenger side of the vehicle and the passenger opened his door and looked back at him. Rogers told the Court that he smelled an odor of marijuana

4

coming from the vehicle, which he identified based on his experience, having smelled the odor before. Officer Rogers stated that his attention was on the passenger of the vehicle and that though a gun and marijuana were found, he was not the one who found the items and did not remember if Defendant said anything. He did remember that Defendant was placed under arrest. Rogers testified that he believed that he placed the passenger in handcuffs.

On cross-examination, Officer Rogers stated that at the time of the arrest, he was wearing a modified uniform, which consisted of an outer vest that had "Police" written across it and held his badge. He did not recall what the other officers were wearing. He testified that he did not confiscate anything from the vehicle and could not say where the marijuana was found. Rogers further testified that he was not aware of any additional drug paraphernalia found in the vehicle. He also testified that the officers may have had a civilian observer riding with them that day.

On redirect, defense counsel asked Officer Rogers about the time the incident took place, to which he responded that it was at 1935 hours. He testified that since the incident, he has done about 100 runs a month and that smelling unburnt marijuana was very common. Rogers testified that he was with two other officers because there are more crew than police vehicles and that each officer has a specific responsibility in regards to officer safety; he was the passenger so he was responsible for the passenger

in the vehicle that they approached.  On recross, Officer Rogers testified that he did not listen to the 911 call before the hearing, did not recall what happened to the vehicle after the arrest, and was not involved with impounding the vehicle.

### ii.    Officer Stephen Kue

Officer Kue testified that the officers received a radio call of shots fired and while canvassing the area, he saw an olive colored Ford Tauras legally parked on Warwick.  He testified that the officers slowly drove by the vehicle and saw the Defendant was in the driver's seat and that there was also a passenger in the vehicle. He testified that the officers turned around and approached the vehicle from behind to inquire whether Defendant or his passenger had heard gun shots, though they did not suspect that anyone in the vehicle had done anything wrong.  Officer Kue told the Court that he stood near the rear of the vehicle while Officer Jackson approached the driver so that he could get a full view of the vehicle and the occupants.

Upon approach, Officer Kue testified that his partner, Officer Jackson, told him that he could smell unburnt marijuana, though Kue could not smell marijuana from his position near the rear of the vehicle.  He further testified that Defendant and his passenger were ordered out of the vehicle and told to place their hands on the hood of the vehicle.  Officer Kue told the Court that he did not see the hand gun initially, but that his partner found the gun and the marijuana.  Officer Kue also told the Court that

6

Defendant told him that he kept the gun because he had recently been robbed. Officer Kue testified the proclamation was not in response to any question that he had asked Defendant.

On cross-examination, Officer Kue testified that at the time of the dispatch call, there was still light outside and that the officers dispatched right away to the 8600 Piedmont location, which was about a mile and a half away from the station. He believed that they were driving in an unmarked scout car and testified that he was wearing a modified police uniform. He also testified that the windows of the police vehicle were not heavily tinted.

When asked whether the department had a manual that provided a time or distance limitation for canvassing an area after a radio call for shots fired, Officer Kue told the Court that no such manual existed. He testified that the officers approached the vehicle to ask Defendant and his passenger if they had heard any shots and he could not remember if Defendant answered in the affirmative. Officer Kue testified that he did not see Defendant making any movements in the vehicle. He also testified that he was not aware of where the marijuana was found, how it was wrapped, or whether there was live ammunition in the weapon that was recovered. When asked the exact time the incident occurred, Officer Kue expressed that he had never looked at the activity log because he did not have access to it. Officer Kue testified that it

was his belief that the incident occurred around 7:45 p.m., though he could not give the exact time the radio call was received because that information, he stated, would be in the activity log.

On redirect, Officer Kue testified that the officers canvassed the area surrounding 8600 Piedmont and that Defendant and his passenger were the first people with whom the officers had contact. He again testified that he did not complete the search of the vehicle and did not recover the gun or the marijuana. When asked how many runs he has completed since the April 13, incident, Officer Kue stated that he has done four to five hundred runs, though there was nothing special about the arrest in this case that would have caused him to remember specific facts. He also testified that he had only reviewed the police report before testifying at the hearing. On recross, when asked whether he had reviewed the police report prior to testifying at Defendant's parole board hearing, Officer Kue testified that he had not because he did not have access to it and had been told by Defendant's prior counsel that he should testify from his own recollection. After being provided with his police report to help refresh his recollection, Officer Kue testified that he believed that 7:45 p.m. was the time that he and the other officers approached the Defendant.

### iii.   Officer Edward Jackson

8

Officer Jackson testified that he is an officer assigned to the eighth precinct and that he has worked there for approximately eight years. He testified that on April 13, 2013, he was working with the special operations unit and received a call about shots being fired at 8600 Piedmont. Jackson testified that on that date, he was wearing a modified police uniform which consisted of cargo pants, equipment around his waist, his badge exposed around his neck, and a black tactical vest which had "Police" written on both the back and front in white writing. Officer Jackson testified that based on his experience, which included a lot of narcotic investigations in the area, he believed 8600 Piedmont to be a high narcotics and crime area.

Officer Jackson testified that the officers responded to the call in an unmarked police vehicle. He told the Court that on that date, the officers had a civilian observer, Alan Sims, riding along with them and that he, Officer Jackson, was the driver of the police vehicle. After arriving at 8600 Piedmont, Officer Jackson testified that he and the other officers were satisfied that the area was okay because the house looked vacant, the door was wide open, and they did not see anyone in the area. He testified that while canvassing the surrounding area, he saw Defendant sitting in a parked car on Warwick, which is directly around the corner from 8600 Piedmont. Officer Jackson testified that Defendant and his passenger were the first people that he and the other officers saw in the area and they approached the vehicle to ask whether

9

Defendant or his passenger had heard or seen anything relating to the shots fired radio call.  He testified that he did not suspect Defendant was involved in any illegal activity when they initially approached the vehicle.  However, while he was walking towards the driver's side door, he saw Defendant bend forward and reach down, which he believed, from previous experience, was consistent with someone trying to conceal contraband.

Upon approaching the driver's side door, Defendant rolled down the window and Officer Jackson asked Defendant if he had seen or heard anything.  At that time, Officer Jackson told the Court that he could smell unburnt marijuana emitting from the vehicle.  Officer Jackson suspected that there could be marijuana in the vehicle and asked Defendant to exit the vehicle.  Jackson testified that after Defendant exited the vehicle, he could see the handle of a gun on the floorboard, protruding from underneath the front seat, in the same area where he had seen Defendant reaching forward.  After searching the vehicle, Officer Jackson testified that he recovered a gun as well as several small, individually wrapped zipped bags of marijuana, which were located in the driver's door panel.  Officer Jackson testified that he heard Defendant say that he was carrying the gun because he was robbed several times, that he did not want to go back to jail, and that Defendant's  statements were not in response to any question that he had asked.

10

On cross-examination, Officer Jackson testified that he noted a set of numbers on the handgun that he recovered from the vehicle, but did not remember exactly where he found the numbers. After refreshing his recollection with his police report, Officer Jackson identified the numbers as "54342," what he believed to be the serial number of the gun. On redirect, Officer Jackson testified that he was not a firearms expert and that he wrote down the set of numbers that he believed to be the serial number of the gun that he recovered. He testified that the numbers were ones that he found on the gun itself, though, again, he could not remember the exact place that the numbers had been located.

Officer Jackson testified that he did not ask for permission to search the vehicle, did not remember smelling any other substance other than marijuana in the vehicle, and did not remember how Defendant responded to his question about whether he had heard shots in the area. Officer Jackson further testified that since the April 13, incident, he has been on 50-60 runs and that well over 20 of them involved the recovery of a firearm. He also testified that he had not had extensive gun training but was certain that the gun that he recovered was a revolver. There was no recross.

### c.    Procedural History

As stated above, Defendant was charged by indictment on May 23, 2013. **[Docket No. 12]** In the May 23, indictment, Defendant was charged with possessing

a firearm, a Smith & Wesson .32 caliber handgun (serial number 54342). **[Docket No. 12 at 2]** On July 26, 2013, Defendant filed two motions, a Motion to Suppress Evidence, **[Docket No. 22]**, and a Motion for an Evidentiary Hearing to Determine the Voluntariness of Defendant's Statement/Confession **[Docket No. 23]**. In his Motion to Suppress, Defendant contends that both the gun and the marijuana "were illegally seized in violation of the Fourth Amendment, . . . without a warrant nor a recognized exception to the warrant requirement in an area wherein Defendant, . . . [had] a reasonable expectation of privacy[.]" In the second motion, Defendant argues Defendant's statements should be suppressed because there is "reason to believe that the[] alleged statements were illegally obtained in violation of the Fifth, Sixth and Fourteenth Amendments . . . ."

Though not the subject of this Order,[1] the Court notes that on September 25, 2013, Defendant filed a Brief in Support of Motion to Dismiss or, in the Alternative, to Suppress Because of Destruction of Evidence. **[Docket No. 28]** In this Motion, Defendant argues that the three counts in the May 23 indictment were "based upon the seizure of a small amount of marijuana and a Smith and Wesson .32 caliber handgun . . . bearing serial number 54342." **[Def. Ex. A]** Defendant notes that the discovery

---

[1]

In this Order, the Court addresses Defendant's July 26, 2013, Motion to Suppress the gun and Defendant's argument that the gun was illegally seized in violation of his Fourth Amendment rights.

12

materials provided to the defense showed that the handgun that was seized bore serial no. 54342. **[Def. Ex. B]** However, during the discovery process, Defendant contends that he received a report from Task Force Officer James J. Wieneck, dated May 30, 2013, "wherein he retrieved a .32 caliber Smith and Wesson from the evidence room at the Detroit Police Department to take into ATF custody . . . [which] bore serial [no.] 521933." **[Def. Ex. C]** Defendant argues that the fact that the gun that was seized bearing serial no. 54342 is no longer in the custody of the Detroit Police Firearms Agents is a violation of his due process rights. The government filed a response to this motion on November 22, 2013 **[Docket No. 36]**.

On October 1, 2013, a First Superseding Indictment was filed, charging Defendant with the same counts as the initial indictment. This indictment, however, listed the serial no. as 521933. Defendant was arraigned on this indictment on November 14, 2013. **[Docket Entry November 13, 2013]**

## II.    ANALYSIS

### A.    Motion to Suppress Evidence, Marijuana and Firearm

Defendant requests that this Court suppress the items seized from the car, the firearm and marijuana. Defendant argues that the items were illegally seized because the police officers did not have a search warrant, nor a recognized exception to search the vehicle without a warrant. The Government argues that a search warrant was not

13

necessary because the encounter was a consensual, casual encounter, that did not change just because Defendant was in the car.  Even if the Court finds that the encounter was not consensual and casual, the Government argues that after the officers saw Defendant reaching down into the vehicle while they were approaching and smelled marijuana when they got closer to the vehicle, the totality of the circumstances gave the officers sufficient basis to ask Defendant to step out of the vehicle.  The Government further argues that pursuant to the automobile exception to the Fourth Amendment's warrant requirement, Defendant "making movements with this hands down near the car's floorboards," in concert with the officers'  knowledge of the general nature of narcotics activity in the area and the smell of marijuana "emitting" from Defendant's car, provided the officers with sufficient probable cause to believe that the car contained contraband or evidence of criminal activity.

Here, Defendant's encounter occurred in five parts: (1) the parking of the unmarked vehicle behind Defendant's car; (2) the officers' initial approach towards Defendant; (3) the officers observation of Defendant reaching down in to the vehicle and smelling marijuana upon further approach; (4) Defendant's exit from the vehicle; and (5) the officers' search of the vehicle.  The Supreme Court has identified three types of reasonable, permissible, and warrantless encounters between the police and citizens:  1) consensual encounters in which contact is initiated by a police officer

14

without any articulable reason whatsoever and the citizen is briefly asked questions;

2) a temporary involuntary detention or *Terry* stop which must be predicated upon

"reasonable suspicion;" and 3) arrests which must be based upon "probable cause."

*United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008).

> **i.     Parking the Police Vehicle, Officers' Initial Approach, and Officers' Further Approach, While Seeing Defendant Reach Towards the Floorboard and Smelling Marijuana**

As a threshold matter, the Court determines that the stop was consensual at the

point where the officers parked their unmarked police car behind Defendant's Taurus,

as well as at the time that the officers made their initial approach towards the vehicle.

A "consensual encounter" occurs when "a reasonable person would feel free to

terminate the encounter." *United States v. Drayton*, 536 U.S. 194, 201 (2002).  There

is no indication on the record that at the time the officers approached Defendant, they

approached for any purpose other than to ask whether he or his passenger knew

anything about the shots that were reportedly fired in the area.  The officers testified

that at the time of parking and initial approach, they did not suspect Defendant was

involved in any criminal activity.  The court deems this part of the encounter

consensual as there is also no indication that the officers parked their vehicle behind

Defendant's in a way that prevented him from being able to leave.  *See, e.g.*, *United*

*States v. See*, 574 F.3d 309, 315 (6th Cir. 2009) (demonstrating that unless there is

other coercive behavior, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave).

The Court also deems the initial approach a consensual encounter.  Officer Jackson testified that while walking towards Defendant's vehicle, he saw Defendant reaching towards the floorboard.  Based on his training and experience, Officer Jackson testified that Defendant's reaching towards the floorboard was consistent with someone attempting to conceal contraband.  Two of the officers testified that as they got closer to Defendant's vehicle, they smelled the scent of unburnt marijuana emitting from the vehicle.  However, the Court notes that all three of the officers testified that at the time they initially approached the vehicle, they approached only to ask Defendant about his knowledge of the shots fired in the area.

The Court notes that at the suppression hearing, defense counsel argued that the officers approached Defendant's vehicle on both sides.  Officer Jackson testified to the same.  However this action, by itself, "does not compel a finding the encounter was not voluntary."  *United States v. Carr*, 674 F.3d 570, 574 (6th Cir. 2012) (determining that because the officers "did not engage in any coercive behavior that would make the encounter non-consensual . . . the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with

16

the officer's request might be compelled," the officer's approach on both sides of the vehicle did not, by itself, make the encounter non-consensual).

### ii.    Officers' Request that Defendant Exit the Vehicle

"Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007). In evaluating a *Terry* stop, the court engages in a two-part analysis of the reasonableness of the stop: whether there was a proper basis for the stop, and, if the stop was proper, whether the degree of intrusion was reasonably related in scope to the situation at hand. *United States v. Smith,* 594 F.3d 530, 536 (6th Cir. 2010). "Reasonable suspicion" is a less demanding standard then "probable cause." *United States v. Mays,* 643 F.3d 537, 542 (6th Cir. 2011). It requires a showing considerably less than preponderance of the evidence, but the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *Id.* (citations omitted). The officers must be able to articulate more than an inchoate and unparticularized suspicion or hunch. *Id.* The officers' determination is made in light of the totality of the circumstances. *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

17

The Court is satisfied that when the officers asked Defendant to exit his vehicle, the encounter ceased being voluntary.  However, the Court is also satisfied that upon approach and viewing the Defendant reach down towards the floorboard of his vehicle, as well as smelling marijuana emitting from Defendant's vehicle, the officers had the requisite level of reasonable suspicion necessary to enforce a *Terry* stop on the car, Defendant, and his passenger.  *See Carr*, 674 F.3d at 572, 574 (determining that a seizure of a Defendant "was constitutional because . . . [t]he combination of [Defendant's] furtive movements ("bending toward the middle console, fidgeting with his hands") with the officers' identification of what appeared to be illegal contraband in the vehicle, provided reasonable suspicion sufficient to support the stop"). Because the officers now had the requisite reasonable suspicion to believe that Defendant was engaged in illegal activity, the officers were justified in telling Defendant to exit the vehicle.  *See  See Penn. v. Mimms*, 434 U.S. 106, 111 (1977) (holding that a police officer may, as a matter of course, order the driver of a lawfully stopped car to exit his vehicle).

### iii.    Search of the Vehicle

The Court moves to the search of the vehicle.  There is a specific exception to the Fourth Amendment warrant requirement pertaining to searches of vehicles.  In *United States v. Smith*, 510 F.3d 641 (6th Cir. 2007), the Sixth Circuit presented a

18

succinct summary of the automobile exception to the Fourth Amendment. The *Smith*

Court stated:

> Pursuant to the Fourth Amendment a search police officers generally must obtain a warrant before conducting a search. However, the Supreme Court has long recognized an exception to the warrant requirement with respect to search of vehicles. The Court's initial cases establishing the "automobile exception" were premised on the "ready mobility" of the automobile, which created "an exigency sufficient to excuse failure to obtain a search warrant." More recent Supreme Court jurisprudence, however, has provided an additional justification for the exception: Even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception. The Court has emphasized that the exception has no separate exigency requirement.
>
> Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they have "*probable cause to believe that the vehicle contains evidence of a crime*." The court's determination of whether probable cause existed at the time of the search is a "commonsense, practical question to be judged from the totality-of-the-circumstances."

*Id.* at 647–48 (internal citations and quotation marks omitted) (emphasis added). The

Court must look at the "objective facts known to the officers at the time of the search,"

not at their subjective intent. *Id.* at 648. In determining the admissibility of evidence

seized during a warrantless search of a vehicle, the Court must answer two questions:

first, whether the initial stop of the vehicle was supported by reasonable suspicion

19

and, second, whether the subsequent search of the vehicle was supported by probable cause. *See United States v. Foster*, 376 F.3d 577, 584-85 (6th Cir. 2004); *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993).

Here, Officers approached Defendant and his passenger to ask if they knew of anything or saw anything in connection to the radio call the officers received about gun shots in the area. The Court again notes that "no seizure occurs when police ask questions of an individual, . . . so long as the officers do not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 437 (1991). The Court notes that on the record before the Court, there is no indication that the officers conveyed this message when they initially approached the Defendant's vehicle to ask what he and his passenger knew. However, as the Court noted above, the encounter became a "seizure" for Fourth Amendment purposes when the officers asked Defendant to exit the vehicle.[2] The court is satisfied that the subsequent "seizure," at the time in which the officers viewed Defendant's actions and smelled marijuana, was based on adequate reasonable suspicion.

---

[2]

Though the encounter remained consensual at the time of approach, even after the officers saw Defendant reaching towards the floorboard of his vehicle and smelled the scent of unburnt marijuana, the Court is satisfied that had the officers been stopping Defendant for these reasons, the stop would have been reasonable based on the totality of the circumstances in this case.

20

Furthermore, the Court is satisfied that the search of the vehicle, upon Defendant's exit, was supported by probable cause. Upon approaching the vehicle, the officer saw Defendant reaching towards the floorboards of the vehicle. Officers may conduct a "reasonable search for weapons for the protection of the police officer" when they have reason to believe that they are "dealing with an armed and dangerous individual." *Terry v. Ohio,* 392 U.S. 1, 27 (1968). It is reasonable to believe that, under the circumstances, officers who are on a call for discharging of weapons who approach a vehicle to ask questions and see an individual reaching to the floorboards of the vehicle may reasonably believe that they are "dealing with an armed and dangerous individual." *Id.* However, the Court need not truly address this concern as the officers noted that upon approach, they also smelled a strong scent of marijuana. The Sixth Circuit Court has held on many occasions that the smell of marijuana, itself, provides probable cause to search the interior of a vehicle for evidence of contraband.[3]

---

[3]

*See United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) (holding that an Agent's smelling marijuana "constituted probable cause to believe that there was marijuana in the vehicle . . . . [and [o]nce this probable cause existed, a search warrant was not necessary"); *United States v. Puckett*, 422 F.3d 340, 343 (6th Cir. 2005) (upholding the denial of a motion to suppress where police "smelled and saw in open view the marijuana in the seat" and "[t]herefore, there was probable cause to search the car at that point"); *United States v. Foster*, 376 F.3d 577, 588 (6th Cir.2004) (holding that "when the officers detected the smell of marijuana coming from Foster's vehicle, this provided them with probable cause to search the vehicle without a search

In sum, the Court is satisfied that the officers' stop and approach towards Defendant's car were initiated as a consensual encounter that later became non-consensual by virtue of what the officers saw and smelled. Temporary stops, where an officer suspects the person is presently engaged in criminal conduct or soon will be, are permitted, including ordering vehicles to stop and the occupants to exit. *See United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005). When getting closer to the Defendant's vehicle, the officers testified that they smelled unburnt marijuana. The Court is satisfied that the officers did not need a search warrant to search the vehicle for marijuana after they smelled marijuana because the smell alone gave the officers the necessary probable cause to search. Consequently, Defendant's Motion to Suppress the firearm and marijuana, both found after the officers smelled marijuana upon approaching the vehicle, is **DENIED**.[4]

---

warrant" which "therefore turned a lawful *Terry* stop into a lawful search"); *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir .2002) (observing that "[t]his court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search" and noting that "[t]he same may be true when marijuana is smelled within a home").

[4]

The Court also notes that the police did not need a search warrant to recover the firearm. Once they obtained the requisite probable cause to search the vehicle based on the smell of marijuana, the officers had probable cause to recover the firearm found during that search. Further, based on the testimony at the suppression hearing, the Court is persuaded that Officer Jackson saw the handle of the firearm protruding from underneath the front, driver's side seat, upon Defendant's exit from the vehicle. Under the plain-view doctrine, "if police are lawfully in a position from which they

22

### B.     Motion Requesting Evidentiary Hearing Pursuant to Frank v. Delaware

In his Motion to Suppress Statements/Confessions, Defendant also requests that this Court grant an evidentiary hearing to determine the voluntariness of Defendant's statements/confessions.  The Court held this hearing on Friday, November 15, 2013, at 9:00 a.m. and the results of this hearing are the basis of this Order.  Therefore, the Court deems this portion of Defendant's motion, having been **GRANTED**.

### C.     Motion to Suppress Evidence Based on Incriminating Statement

In Defendant's motion to suppress his statements, Defendant claims that because he was arrested without a valid arrest warrant, the statements he made after

---

view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (quotation marks omitted).  "[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passerby or diligent police officers.'" *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008) (quoting *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996).  After asking Defendant if he had a license to carry a firearm, Defendant replied in the negative.  After Officer Jackson observed the handle of firearm sticking out from under the front seat of Defendant's vehicle, the Court is satisfied that the police officers had probable cause to believe that Defendant's vehicle contained evidence of a violation of the Michigan statute that criminalizes the carrying of a firearm in a vehicle without a license, and that this provided independent probable cause, giving the officers the lawful right to access the interior of the Defendant's vehicle to the seize firearm. *See, e.g.*, *United States v. Galaviz*, 645 F.3d 347 (6th Cir. 2011) (affirming the district court's denial of Defendant's motion to suppress and stating the same).

23

the police recovered the gun from the vehicle should be suppressed.  In response, the Government argues that the officers conducted a valid automobile search and that Defendant's statements were not coerced, but made spontaneously.  The Government argues that even if not spontaneous, Defendant's statements are still admissible because Defendant was not in "custody" and the statements were not the result of a custodial interrogation.

The officers testified that after being told to exit his vehicle, Defendant made the following statement to the officers: "Man I was just robbed, that's why I'm packing heat."  A defendant's statement must be "made freely, voluntarily and without compulsion or inducement of any sort."  *Haynes v. Washington,* 373 U.S. 503, 513 (quoting *Wilson v. United States,* 162 U.S. 613, 623 (1896)).  Here, Defendant argues that his statement was involuntary because he was in custody at the time it was made.  "Custody" is defined as the "intentional application of physical force and show of authority with *intent of acquiring physical control.*"  *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002).  In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court defined "interrogation" as referring "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.* at 301.  "[I]nterrogation, as

24

conceptualized in the *Miranda  [v. Arizona*, 384 U.S. 436 (1966)] opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300.

To determine the voluntariness of a confession, a three-part test has been established.  First, the court must determine whether the confession was extorted by objectively coercive police activity.  *See United States v. Newman*, 889 F.2d 88, 95 (6th Cir. 1989)(citing *McCall v. Dutton*, 863 F.2d 454 (6th Cir. 1988)).  The court may not proceed to the second and third parts of the test if the accused cannot show objective coercion by the officers because "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'"  *Newman*, 889 F.2d at 95.  Regardless of a defendant's state of mind, a confession is voluntary absent police coercion.  *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).  A finding that the first part of the three-part test has not been met ends the inquiry.  *McCall*, 863 F.2d at 459-60.

If the court determines there was objectively coercive police activity, the court must secondly determine whether the coercion was sufficient, considering the subjective state of mind of the defendant, to have overborne his will.  Finally, the defendant's will must have been overborne as a result of the coercive police activity. *Newman*, 889 F.2d at 95.  To determine whether the defendant's will was overborne,

25

the court should consider the totality of the circumstances. *Haynes*, 373 U.S. at 513; *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994). The following factors may be considered to determine the totality of the circumstances: 1) the age, education, and intelligence of the defendant; 2) whether the defendant was informed of his constitutional rights; 3) the length of the interrogation; 4) whether the question was repeated and prolonged; and 5) whether the officers utilized physical punishment, such as the deprivation of food or sleep. *Ledbetter*, 35 F.3d at 1067.

Based on the testimony at the hearing, Defendant's statement was a spontaneous one, not made while Defendant was in legal "custody" and not made as the result of any "interrogation" by the officers. There is no indication on the record that at the time that Defendant stepped outside of his vehicle and made the statement, the officers applied any physical force or intended to acquire physical control over the Defendant. Testimony at the hearing showed that Defendant was not placed under arrest until after the weapon was recovered, which the Court is satisfied based on the testimony, was at some point in time following his statement. In sum, the Court is satisfied that Defendant was asked to exit his vehicle, made the statement, was asked if he had a license to carry the gun, and responded in the negative. The Court is further satisfied that after Defendant's response, Officer Jackson retrieved the gun that he'd seen, and Defendant was arrested. Because Defendant was not subject to

26

"interrogation" at the time he made the statement and was not in "custody" for *Miranda* purposes, the Court is satisfied that Defendant's statement "was a spontaneous and voluntary utterance." *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir. 1983). There was no violation and Defendant's motion to suppress on these grounds is denied.

The Court determines that even if it were to assume that Defendant was in "custody," Defendant has failed to show any coercive police activity which would have caused him to make the statements. Defendant has also failed to show that any interrogation took place. Defendant was not under arrest at the time of the statement and he has not alleged that the officers asked him any questions to which his statement responded. The Court finds that Defendant's statement was voluntary, not in response to any question, and not the product of any coercive police conduct. "Any statement given freely and voluntarily without any compelling influences is . . . admissible into evidence." *Miranda*, 384 U.S. at 478. Defendant's motion to suppress his statements is **DENIED**.

## III.   CONCLUSION

Accordingly,

27

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence **[Docket No. 22, July 26, 2013**] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Statements/Confessions **[Docket No. 23, filed July 26, 2013]** is **DENIED**, but Defendant's specific request for a hearing is **GRANTED**.

**IT IS SO ORDERED**.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  December 18, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 18, 2013, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager